NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT AND SHERYL LAUGHLIN, | |
| Plaintiff, | Civil Action No. 13-4414 |
| v. | **OPINION** |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

PISANO, District Judge

Plaintiffs Robert and Sheryl Laughlin ("Plaintiffs") have brought suit against Defendant Bank of America, N.A. ("BANA" or "Defendant"), in a case arising out of BANA's alleged promise to timely modify Plaintiffs' home mortgage loan as part of a federal program aimed at stemming the foreclosure crisis. Before the Court is BANA's motion to dismiss Plaintiffs' Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs oppose this motion. The Court decides this motion based on the submissions of the parties and without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons stated below, the Court will grant this motion in part, and deny the motion in part.

I.  **Background**[1]

In the most general of terms, the federal Home Affordable Modification Program ("HAMP") is a program that was announced in February 2009 as part of the Making Home Affordable ("MHA") program. HAMP was one of several assistance programs created in an effort to stem the

---

[1] The following allegations are summarized from the Complaint, and must be taken as true in deciding this Motion to Dismiss. *See Newman v. Beard*, 617 F.3d 775, 779 (3d Cir. 2010) ("We accept all factual allegations as true, construe the amended complaint in the light most favorable to [the plaintiff], and determine whether, under any reasonable reading of the…complaint, he may be entitled to relief.").

foreclosure crisis,[2] and is intended to lower a qualifying mortgagors' monthly payments to 31% of their verified monthly gross income in order to make payments more affordable. *See* Compl. ¶ 9. Plaintiffs own a home in Neshanic Station, New Jersey. BANA is the loan servicer, mortgagee, and note holder of the loan that Plaintiffs took out on April 7, 2010 to purchase their home. By 2011, Plaintiffs were having difficulty making their mortgage payments.

On or about July 25, 2011, Plaintiffs applied for a HAMP modification with BANA. After months of delay and inconsistent responses, BANA informed Plaintiffs that they qualified for the HAMP program and would be placed in a trial period plan. On February 9, 2012, Plaintiffs received their HAMP Loan Modification Packet. Plaintiffs, however, were told if they accepted a trial period plan under HAMP, they would be ineligible to short sell[3] their house. Plaintiffs opted out of the proposed HAMP modification plan in order to remain eligible for a short sale.

Plaintiffs were eventually advised by a BANA representative to accept a HAMP modification instead of attempting a short sale. Plaintiffs were not allowed to have the previously-offered HAMP Trial Plan reinstated; therefore, on April 11, 2012, Plaintiffs resubmitted the necessary financial documentation required in order to be considered for a modification. On June 21, 2012, Plaintiffs received a Notice of Intent to Foreclose. On that same day, Plaintiffs received a phone call from a BANA representative, informing them that they were denied a loan modification,

---

[2] HAMP is authorized by the Emergency Economic Stabilization Act of 2008, P.L. 110-343, 122 Stat. 3765. The centerpiece of the Act was the Troubled Asset Relief Program (TARP). Among many other duties, TARP requires the Secretary of Treasury to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." 12 U.S.C. § 5219(a). TARP also gives the Secretary authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.* "Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure." *Wigod v. Wells Fargo Bank*, 673 F.3d 547, 556 (7th Cir. 2012).

[3] A "short sale" in real estate occurs when the outstanding loans against a property are greater than what the property is worth and the lender agrees to accept less than it is owed to permit a sale of the property that secures its note.

and would need to make at least one monthly loan payment in order to qualify for any mortgage assistance programs.  On June 25, 2012, Plaintiffs made this payment.  After submitting additional paperwork, Plaintiffs were advised on July 16, 2012 that their modification request was under review.

On August 15, 2012, Plaintiffs eventually received a Federal Housing Agency ("FHA") Trial Period Plan Agreement (Special Forbearance Type II for Modification) dated August 1, 2012 [hereinafter, the "TPP"].  On the same day, Plaintiff Robert Laughlin spoke with a BANA representative about his concern regarding the calculation of the amount due under the loan.  Plaintiff Robert Laughlin believed that a portion of the principal balance was being "double-counted" because BANA was adding unpaid principal on top of the balance due on the loan.  Plaintiffs allege that the BANA representative informed them that this was how the calculation was done.  Plaintiffs then "accepted the terms of the Trial Plan . . . ."  Compl. ¶ 78.

> According to the Complaint, the TPP contained the following language:
>
> **Modification**. At the successful conclusion of the Trail Period Plan, I will be offered a Modification in accordance with FHA requirements.  Servicer estimates that the terms of the modification will be set forth on Schedule 1 to this Agreement.  I understand these terms are estimates and could change based on additional payments on the Loan, escrow changes and disbursements, and other factors.  If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true and correct and I fulfill all my obligations in Section 4, the Servicers will send me the final documentation for a Modification, which when executed, returned and accepted by the Servicer, will cure the default on my Loan.

Compl. ¶ 74.  The TPP stressed that it was "not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until I meet all the conditions required for modification . . . ."  *Id.* at ¶ 75.  The TPP also stated that:

> H.   The Servicers will not be obligated to complete the Modification *if* I fail to meet any of the requirements under this Plan, *if* I vacate the property or no longer continue to reside in the property as my primary residence, or *if* I am in default under the Loan Documents for any other reason other than the failure to make payments that will be cured at completion of this Plan through the Modification.

3

*Id.* at ¶ 75 (emphasis in Complaint).

Under the terms of the TPP, Plaintiffs were obligated to make three monthly payments on or before September 15, 2013, October 15, 2013, and November 15, 2013. Plaintiffs allege that they made each of the requisite Trial Period payments in accordance with the term of the contract, and complied with all the conditions required for modification under the contract. Plaintiffs allege that they provided "extensive financial information," submitted a "hardship affidavit" concerning their personal circumstances, agreed to undergo credit counseling, and made payments into newly-established escrow accounts. *See* Compl. ¶ 110. On November 30, 2012, Plaintiffs were told that their loan modification request was under review, and that they would receive a final loan modification within 30-45 days. They were advised to continue making the monthly trial payments in the meantime.

On January 2, 2013, BANA acknowledged Plaintiffs' compliance with the FHA Trial Plan Agreement, and advised in writing to continue making trial payments under a final loan modification was processed. Plaintiffs were not told how these payments would be applied while they were waiting for a final loan modification. In March, Plaintiffs spoke to another BANA representative, who told them their application was at the management level and instructed the Plaintiffs to make another trial payment. On March 23, 2013, Plaintiffs received a letter from BANA informing them that BANA was "unable to offer [them] permanent assistance because [they] did not make the required Trial Period payments on time." Compl. ¶ 91. Plaintiffs then were provided with a permanent loan modification offer on April 10, 2013. From the time between when the TPP ended and Plaintiffs' receipt of the permanent loan modification, they made one "good-faith" payment.

The terms of the permanent loan modification offer indicated that the modified principal balance would be $680,042.78. Plaintiffs' pre-modification balance was $617,735.87. The

4

proposed modified loan also extended the term of the loan for thirty years, providing that the loan would now mature on November 1, 2042.  Finally, the proposed permanent loan modification included a balloon payment of $25,013.27, which reflects the "missed" payments from the period between the end of the TPP and before the permanent loan modification offer.

## II.   **Procedural History**

Plaintiffs filed this Complaint on June 10, 2013 in the Superior Court of New Jersey, Law Division, Somerset County.  The Complaint asserts three claims:  (1) a violation of New Jersey's Consumer Fraud Act (the "NJCFA"), N.J.S.A. 56:8-1, *et seq.*, (2) breach of the TPP and, (3) breach of the duty of good faith and fair dealing.  On July 22, 2013, BANA removed the matter to this Court, asserting that the Court had jurisdiction over the matter based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.  BANA asserted that the amount in controversy exceeded $75,000, exclusive of interest and costs, because the outstanding principal balance of the mortgage was $620,810.68 as of June 2013.  BANA then filed this current motion to dismiss on September 11, 2013.

The Court then *sua sponte* raised the question of subject matter jurisdiction, and ordered BANA, as the removing party, to show cause as to why this case should not be remanded.  The Court found that the relevant amount in controversy in this case would be the alleged damages affiliated with Plaintiffs' allegations regarding the delay in receiving a permanent loan modification, not the outstanding principal balance of the mortgage.  A review of the Complaint revealed that Plaintiffs essentially had alleged an ascertainable loss under the NJCFA of $25,013.27—an amount that represents the balloon payment that was included in their permanent loan modification—but it was unclear if Plaintiffs were alleging that this full amount of the balloon payment was improper.  The Court also questioned if it was legally possible for the recovery of such damages.  Considering that the Complaint provided no other specific information as to the value of other damages claimed

5

by Plaintiffs, the Court was forced to speculate as to if it could assert jurisdiction properly over the matter.

On April 7, 2014, BANA responded to the Order to Show Cause, and asserted that the little over $25,000 that Plaintiffs alleged as an ascertainable loss under the NJCFA put the amount in controversy over the jurisdictional requirement of $75,000.  BANA apparently interprets the Complaint to mean that Plaintiffs were seeking to recover as damages the $25,013.27 balloon payment in their permanent loan modification.   While the Complaint itself only states that "the precise and specific amount of the ascertainable loss suffered by Plaintiffs is the $25,013.27 in 'missed' payments…," BANA points to the Plaintiffs' opposition brief filed in response to the motion to dismiss, in which Plaintiffs state that they "suffer[ed] damages in the amount of $25,013.27 in 'missed' mortgage payments . . . ."  Because this amount can be trebled pursuant to the NJCFA, BANA asserts that jurisdiction in this Court is proper.  Without further argument from BANA regarding the ability or appropriateness of such a payment, and no documentation regarding the terms of any of these modification agreements, the Court finds—at this stage of the proceedings—that BANA has met its burden of proving that federal jurisdiction exists in this Court. The Court will therefore proceed to the pending motion to dismiss.

**III.    Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  All reasonable inferences must be made in the Plaintiff's favor.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). When assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Any legal conclusions are "not entitled to the assumption of truth" by a reviewing court. *Id*. at 679. Rather, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.; *see also Fowler*, 578 F.3d at 210 (explaining that "a complaint must do more than allege a plaintiff's entitlement to relief").

## IV. Discussion

### A. New Jersey Consumer Fraud Act

Count One of Plaintiffs' Complaint alleges that BANA violated the NJFCA with its "deliberate pattern of delay employed during the modification and foreclosure process" and when it "recapitalized unpaid principal into the loan, thereby adding principal on top of principal in a fraudulent and unconscionable accounting practice." Compl. ¶¶ 98, 102. BANA argues that, as a matter of law, the NJCFA does not encompass unconscionable business practices in connection with the loan modification process, and therefore Plaintiffs' claim must be dismissed.

The NJCFA "provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) (citing *Lee v. Carter-Reed Co.*, 203 N.J. 496, 521 (2010)). The Act is "applied broadly in

order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo v. Benefit Mgmt. Corp.*, 150 N.J. 255, 264 (1997).  Under the NJCFA, a plaintiff who establishes: "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful conduct and the ascertainable loss,' is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees, N.J.S.A. 56:8–19." *Gonzalez*, 207 N.J. at 576 (quoting *Lee*, 203 N.J. at 521).  The NJCFA defines an "unlawful practice" as

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived, or damaged thereby….

N.J.S.A. 56:8-2.  The term "advertisement" is defined, in relevant part, as "the attempt … to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan." N.J.S.A. 56:8-1(a).

BANA argues that Plaintiffs' allegations regarding its business practices during the loan modification process are not premised upon "the sale or advertisement" of Plaintiffs' property, and therefore are not encompassed within the NJCFA as a matter of law.  The Court disagrees.  Recently, the New Jersey Supreme Court held that post-foreclosure judgment agreements "constitute the extension of credit, or a new loan, and that [a servicer's] collection activities may be characterized as 'subsequent performance' in connection with the extension of credit." *Gonzalez*, 207 N.J. at 581 (quoting N.J.S.A. 56:8-2).  The post-foreclosure judgment agreements that the parties had entered into "retained every characteristic of the initial loan – and more," as the plaintiff was obligated to her regular monthly payments, "along with a host of additional charges: late payment fees, foreclosure costs, attorneys' fees, insurance fees on the subject property, and interest

on the arrearages." *Id.* The Supreme Court stressed that the post-foreclosure judgment agreements were akin to a "newly minted loan," because they involved a stand-alone extension of credit. *Id.* at 582. Because the servicer's activities constituted "subsequent performance" in connection with those loans, the Court held that "in fashioning and collecting on such a loan—as with any other loan—a lender or its servicing agent cannot use unconscionable practices in violation of the CFA." *Id.* at 586-87.

Relying on this decision, another court in this District determined that "the same principle" applies to mortgage modifications, holding that such modifications are covered under the NJCFA because they "effectively operate as subsequent performance on the original agreement." *Beals v. Bank of Am.*, Civil Action No. 10-5427, 2011 WL 5415174, at *17 (D.N.J. Nov. 4, 2011). In *Beals*, the named plaintiffs of a proposed class action each had a mortgage with Bank of America, and each eventually fell behind on payments and negotiated a modified payment plan with the servicer. The plaintiffs alleged that Bank of America committed fraud in connection with the mortgage foreclosure modifications. Defendant Bank of America moved to dismiss the claim, arguing that the mortgage foreclosure modifications were not "in connection with the sale or advertisement of any merchandise or real estate." The Court recognized that this used to be a "fairly open question," until the decision in *Gonzalez*. The Court found that the modifications negotiated by the plaintiffs and the servicer represented the same type of subsequent conduct that existed in *Gonzalez*, and that the plaintiffs had successfully pled "unlawful conduct" as required under the CFA. *Id.* at *16-17. As the Court explained: "The [plaintiffs] had a mortgage with Bank of America, and after they fell behind on payments, the servicer negotiated with them regarding a modified payment plan. Just as the post-judgment agreement was covered under the [NJ]CFA, so too are the modifications here, which effectively operate as a subsequent performance on the original agreement. Therefore, plaintiffs have properly pleaded an 'unlawful purpose.'" *Id.* at *17.

9

Considering these cases, the Court finds that allegations of "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact" during the loan modification process constitute unlawful conduct in violation of the NJCFA.  Similar to the *Beal* plaintiffs, Plaintiffs have a mortgage with BANA and, after they fell behind on mortgage payments, worked with BANA to modify the terms of their mortgage.  It is not particularly significant that the *Beal* plaintiffs did not seek a modification under HAMP.  Rather, both cases refer more generally to the business practices of a servicer in modifying the terms of a homeowner's mortgage.  The loan modification process, from negotiation to the signing of a permanent modification, effectively operates as a subsequent performance on the original mortgage.  The terms of the NJCFA specifically define "unlawful conduct" to cover such subsequent performance on a loan.  Considering the "broad legislative intent evident from the language and the policy goals of the [NJ]CFA," it would be disingenuous to hold that a servicer would be free from the ramifications of violating the NJCFA if it engaged in unlawful conduct while participating in a loan modification. *Lemelledo*, 150 N.J. at 264.  Just as fraud, deception, and other similar types of conduct are not justified in forming a loan, *see id.* at 265, [4] so are they not permitted in attempts to modify a loan. Therefore, a loan servicer's business practices during the loan modification process are covered by the CFA.[5]  Accordingly, Count One will not be dismissed on this basis.

---

[4] Alternatively, to the extent that permanent loan modifications operate as "new loans" in that they are new extensions of credit as described in *Gonzalez*, any examples of fraudulent or otherwise unconscionable conduct leading up to the new extension of credit would be covered under the NJCFA. *See Lemelledo*, 150 N.J. at 265.  Similarly, while the parties argue about whether or not the TPP constitutes a binding contract to offer permanent mortgage modifications, any sort of determination on what a TPP promises, if anything, is irrelevant here.  Regardless of if the TPP obligates a loan servicer to offer a permanent loan modification, the TPP, at its core, operates as part of the mortgage modification process.  Therefore, any sort of allegations regarding unconscionable business practices in entering into a TPP or in the period of time after the trial period ends all relate to mortgage modifications and operate as the subsequent performance of a servicer in connection with the mortgage.

[5] In its Opposition, Plaintiffs rely entirely on *Slimm v. Bank of Am. Corp.*, Civil No. 12-5846, 2013 WL 1867035, at *13-14 (D.N.J. May 2, 2013), for the proposition that BANA's business practices during the

**B.     Contract Claims for Breach of the TPP**

In Count Two of their Complaint, Plaintiffs have alleged that BANA has breached the terms of the TPP when it failed to offer a permanent mortgage modification at an interest rate at 3.875% effective on December 1, 2012.  BANA argues that this claim must fail because the TPP is not a binding contract as a matter of law, and, alternatively, that Plaintiffs' Complaint establishes that BANA complied with the provisions of the TPP.  The Court addresses these arguments below.[6]

First, BANA argues that the TPP is not a valid enforceable contract as a matter of law.  Its argument is essentially that it had no obligation to offer Plaintiff any permanent loan modification under any situation.  Plaintiffs assert, however, that the TPP is a valid, enforceable contract that requires servicers to offer permanent loan modifications so long as Plaintiffs made timely payments, provided the requisite documentation, and otherwise complied with the requirements and obligations under the TPP.

The question of whether the TPP that was sent to Plaintiffs created an enforceable contract for a permanent loan modification is an issue that been the subject of much litigation among multiple jurisdictions.   Several courts have found that the TPP does create an enforceable agreement to at least offer a permanent loan modification, at least to survive a motion to dismiss

---

loan modification are not covered by the CFA as a matter of law.  *See Slimm*, 2013 WL 1867035, at *14 (explaining that because plaintiffs asserted that the Defendants "engaged in false and unlawful deceptive practices 'in connection with mortgage modifications,'" their allegations "are not premised upon the sale or advertisement of their property" and therefore fell "outside the ambit of the NJCFA").  For the reasons discussed above, this Court finds that reasoning unpersuasive.  Furthermore, the *Slimm* Court relied upon the "plain language of the statute" in narrowly interpreting what constitutes unlawful conduct under the CFA.  New Jersey courts, however, have made clear that the CFA "does not attempt to enumerate every prohibited practice" and should be applied broadly and interpreted liberally in favor of the consumer.  *See Gonzalez*, 207 N.J. at 576 (internal quotations and citations omitted).

[6] While HAMP does not create a private right of action for borrowers, *see Keosseian v. Bank of Am.*, Civil Action No. 11-3478, 2012 WL 458470 (D.N.J. Feb. 10, 2012), Plaintiffs have brought this suit on the theory that the TPP constituted a contract under state law between Plaintiffs and BANA.  Plaintiffs' claims, therefore, rise under the alleged failure of BANA to comply with its contractual obligations under the TPP or state contract law, not under HAMP or any other federal statute.  *See Stolba v. Wells Fargo*, Civil Action No. 10-6014, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011);  *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 576-81 (7th Cir. 2012).

11

under Rule 12(b)(6). *See, e.g.*, *Corvello v. Wells Fargo Bank*, 728 F.3d 878, 883-85 (9th Cir. 2013) (holding that the "natural and fair interpretation of the TPP" is that the servicer must send a modification agreement "offering to modify the loan once borrowers meet their end of the bargain"); *Wigod v. Wells Fargo Bank*, 673 F.3d 547, 563 (7th Cir. 2012) (holding that the TPP was an offer to provide a permanent modification agreement if borrower fulfilled necessary conditions); *Alimena v. Vericrest Fin., Inc.*, 964 F. Supp. 2d 1200, 1216-17 (E.D. Cal. Aug. 9, 2013) ("[A]ssuming the borrower satisfies the requirements therein, the TPP constitutes an enforceable agreement to permanently modify a mortgage."); *Lazo v. Bank of Am.*, Civil No. 12-00762, 2012 WL 1831577, at *6 (N.D. Cal. May 18, 2012) (stating that once plaintiff made its three required payments, the terms of the TPP required Bank of America to provide a loan modification offer); *Cave v. Saxon Mortgage Servs., Inc.*, Civil Action No. 12-5366, 2013 WL 1915660, *4-6 (E.D. Pa. May 9, 2013) (breach of contract claim sufficient at pleadings stage); *Cave v. Saxon Mortgage Servs., Inc.*, Civ. Action No. 11-4586, 2012 WL 1957588, at *5-6 (E.D. Pa. May 30, 2012) (concluding that the TPP contained a clear promise to provide the borrowers with a permanent modification if several conditions were met); *Bosque v. Wells Fargo Bank*, 762 F. Supp. 2d 342, 351-52 (D. Mass. 2011) (finding plaintiffs sufficiently alleged a breach of contract claim).

Other courts, after reviewing the language in the TPP, have found that it is simply one step in the application process towards a permanent modification, and therefore cannot form the basis for a breach of contract claim because there was no guarantee of a permanent modification. Courts have also dismissed these claims based upon a failure to allege that all the necessary conditions precedent have been met. *See, e.g.*, *Reitz v. Nationstar Mortgage*, LLC, 954 F. Supp. 2d 870, 885-88 (E.D. Mo. 2013) (holding that the TPP was not a valid enforceable contract that required a permanent mortgage modification); *Pandit v. Saxon Mort. Servs.*, No. 11-cv-3935, 2012 WL 4174888, at *5 (E.D.N.Y. Sept. 17, 2012) (finding, based upon the language in the entire TPP, that

the TPP "was but one step on the road towards modification") (citing cases); *Lucia v. Wells Fargo Bank*, 798 F.Supp.2d 1059, 1066-68 (N.D.Cal. 2011) (dismissing breach of contract claim under Rule 12(b)(6) on the basis that TPP did not give rise to enforceable contract because the plaintiffs had not alleged that they had received a modification agreement, as required under Section 2 of the TPP); *Stolba v. Wells Fargo*, Civil Action No. 10-6014, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011) (finding that the language of the TPP made clear that satisfying the conditions in the TPP did not guarantee a permanent modification); *Bourdelais v. J.P. Morgan Chase*, Civil Action No. 10-670, 2011 WL 1306311, at *4-5 (E.D. Va. Apr. 1, 2011) (finding plaintiffs failed to state a claim because they failed to allege that they qualified for a permanent modification or that they received a copy of an executed copy of the permanent modification as required as a condition under the TPP); *Lonberg v. Freddie Mac*, 776 F. Supp. 2d 1202, 1209 (D. Or. 2011) (finding that, because plaintiff failed to allege that the defendant determined the plaintiff met the requirements of the TPP or that the defendant sent the plaintiff a loan modification executed by both parties, no binding contract had been alleged).

      BANA argues that *Stolba* should control here. In *Stolba*, the Court found that the plaintiffs could not plausibly state a breach of contract claim based upon their TPP. The Court, however, based this finding on the plain language of the TPP documents, which stressed that a borrower "*may* qualify for a HAMP TPP" and that a borrower would be offered a permanent loan modification "*If* we are able to modify your loan under the terms of the program…." *Stolba*, 2011 WL 3444078, at *3 (quotations and citations omitted) (emphasis in original). Likewise, in *Slimm*, the Court found that a cover letter sent to the plaintiffs indicated that the TPP did not create an individual obligation, but rather was only a part of the process towards achieving a permanent modification. *See Slimm*, 2013 WL 1867035 at *11.

13

The problem with BANA's argument, however, is that it has failed to show that any such similar provisions exist in this TPP, and none are alleged by Plaintiffs in their Complaint.[7] The Court cannot assume that such provisions exist in the TPP. Because such or similar language was not alleged to be part of the Plaintiffs' TPP and because the Court does not have a copy of Plaintiffs' TPP before it, BANA's assertion that the TPP did not obligate BANA to provide Plaintiffs with a permanent loan modification as a matter of law falls short. *See Picini v. Chase Home Fin. LLC*, 854 F. Supp. 2d 266, 274 (E.D.N.Y. 2012). Therefore, BANA's motion to dismiss the contract claim on this basis must fail.

Defendants also argue that—assuming that the TPP is an enforceable contract that obligated them to provide a permanent loan modification—Plaintiffs have failed to allege that BANA did not comply with the provisions of the TPP because it offered them a permanent loan modification. Whether or not BANA had an obligation to offer the permanent loan modification, and whether or not BANA performed in accordance with any alleged obligations, is a fact issue. Therefore, at this stage of the proceedings, the Court will deny BANA's motion to dismiss Count Two of the Complaint, without prejudice.

### C. Claim for Breach of Duty of Good Faith and Fair Dealing

In its motion to dismiss, BANA asserts that Count Three of Plaintiffs' Complaint for a breach of the duty of good faith and fair dealing should be dismissed because the TPP is not an enforceable contract. *See* Br. at 6. Having found, however, that Plaintiffs have stated a claim for

---

[7] Furthermore, and of note here, the *Stolba* and *Slimm* plaintiffs both brought breach of contract claims based upon the denial of their permanent loan modification. Indeed, in almost every case in which a court has granted a motion to dismiss a contract claim, the breach of contract is premised upon a servicer denying the plaintiffs a permanent loan modification agreement. Here, however, Plaintiffs allege that BANA failed to uphold its alleged contractual duties as established by the terms of the TPP agreement.

14

breach of contract, the motion to dismiss the claim for a breach of the duty of good faith and fair dealing will be denied, without prejudice.[8]

## V.     Conclusion

For the reasons stated above, BANA's Motion to Dismiss will be granted in part and denied in part.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: June 11, 2014

---

[8] BANA has also argued that "Plaintiffs' additional allegation that HAMP imposed an implied duty on BANA to make the terms of [the TPP] permanent" must also be dismissed, as borrowers have no standing to sue under HAMP. Br. at 6.  The Court agrees with the premise that borrower has no standing to sue under HAMP, but has not interpreted Plaintiffs' claim as alleging that there was an implied duty under HAMP to make the terms of the TPP permanent.  Rather, the Court believes that Plaintiffs are alleging that BANA breached its implied duty, based upon the contractual relationship between Plaintiffs and BANA, to diligently evaluate Plaintiffs for a permanent loan.